UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

************************************************************

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO.: 1:25MJ81 |
| | OCTOBER 6, 2025, 11:02 A.M. |
| | ABINGDON, VIRGINIA |
| Plaintiff, | DETENTION HEARING |
| vs. | |
| | Before: |
| TERRY ALEXANDER HEADEN, | HONORABLE PAMELA MEADE SARGENT |
| | UNITED STATES MAGISTRATE JUDGE |
| Defendant. | WESTERN DISTRICT OF VIRGINIA |

************************************************************

APPEARANCES:

For the Government: CARRIE LEE MACON, ESQUIRE
DOJ-USAO
Western District of Virginia
180 W. Main Street, Suite B-19
Abingdon, VA 24210

For the Defendant: JAXON WILKENS, ESQUIRE
The Law Office of Kern and Wilkens, PC
1719 Second Avenue E
Big Stone Gap, VA 24219
276-523-1281

Court Reporter: Lisa M. Blair, RPR, RMR, CRR, FOCR
255 West Main Street, Suite 304
Charlottesville, Virginia 22902
434.296.9284

PROCEEDINGS RECORDED BY ELECTRONIC RECORDING; TRANSCRIPT PRODUCED BY COMPUTER.

INDEX OF WITNESSES


| WITNESSES ON BEHALF OF THE GOVERNMENT: | PAGE |
|---|---|
| BROOKE RHYMER | |
| Direct Examination by Ms. Macon | 4 |
| Cross-Examination by Mr. Wilkens | 5 |
| Redirect Examination by Ms. Macon | 7 |
| BRANDON CODY VINES | |
| Direct Examination by Ms. Macon | 27 |
| Cross-Examination by Mr. Wilkens | 30 |
| Examination by the Court | 31 |
| WITNESSES ON BEHALF OF THE DEFENDANT: | |
| OLIVIA BROWN | |
| Direct Examination by Mr. Wilkens | 10 |
| Cross-Examination by Ms. Macon | 16 |
| Redirect Examination by Mr. Wilkens | 21 |
| Examination by the Court | 21 |
| Further Cross-Examination by Ms. Macon | 25 |

(Proceedings commenced, 11:02 a.m.)

THE COURT: Good morning.

The Court has before it this morning the case of *United States of America v. Terry Alexander Headen.* It's Case Number 1:25mj81.

Mr. Headen is before the Court today for a detention hearing. He previously appeared before the Court last week or week before last based on his arrest on a criminal complaint, and his detention hearing was scheduled over for today.

Is the government prepared to proceed at this time?

MS. MACON: Yes, Your Honor.

THE COURT: Is the defense prepared to proceed?

MR. WILKENS: We are, Your Honor.

THE COURT: Did we schedule this for a preliminary hearing at the same time, or did he waive a preliminary hearing? That's what I was looking for.

MR. WILKENS: Your Honor, my client waived a preliminary hearing at the initial appearance.

THE COURT: I see that now. Thank you. I just couldn't put my eyeballs on it this quickly.

Does the government have evidence it wishes to present?

MS. MACON: Yes, Your Honor The. Government would call Probation Officer Brooke Rhymer.

THE COURT: You may. If you'll step around to be

sworn, please.

BROOKE RHYMER, CALLED BY THE GOVERNMENT SWORN,

DIRECT EXAMINATION

BY MS. MACON:

Q Good morning, Officer Rhymer. Please state your name.

A Brooke Rhymer.

Q Were you involved in the preparation of the pretrial services report for Mr. Headen?

A Yes, ma'am.

Q Since the preparation of that report, have you learned any additional information?

A I have.

Q What have you learned?

A The criminal history listed in the report on pages 3 and 4, the charge on page 3, the June 8th, 2020 arrest in McDowell County, possession with intent to sell, deliver cocaine, he was not indicted on that charge. And then if you flip over to page 4, the May 25th, 2024 arrest, he was convicted of the drugs -- the possession of a controlled substance. And then the August 16th, 2024 arrest, he was convicted of the destruction of property. The reckless driving and loitering were both dismissed. He was placed on six months unsupervised probation in order to participate in the day reporting program.

Q During the course of that probation in West Virginia, has Mr. Headen been drug tested?

A He is.
Q What were some of the results of those drug tests?
A So he has had drug screens -- and I'll just kind of summarize these -- June 26th, July 8th, July 15th, July 22nd, July 29th, August the 11th. All of those drug screens were positive for marijuana only. And then the drug screens from August 25th and September 8th were positive for marijuana and fentanyl. Both of those were positive for marijuana and fentanyl.
Q During Mr. Headen's pretrial services interview, did he report he also took opiates?
A Yes.
Q And did he also report that he only uses them two to three times a week, because he has to report to probation every two weeks?
A Yes. He said he had to provide a drug screen every two weeks. So he only uses them two to three times a week.
Q Is it your understanding that Mr. Headen is still currently on probation in West Virginia?
A As far as I'm aware, yes.

MS. MACON: No further questions.

THE COURT: Mr. Wilkens, questions of the officer?

MR. WILKENS: Yes, Your Honor, thank you.

THE COURT: You may.

CROSS-EXAMINATION

BY MR. WILKENS:

Q So with regards to the charge of possession, were you able to ascertain what the substance was?

A I did not. I assume that it's a misdemeanor conviction.

Q So you believe it's a misdemeanor conviction and not a felony conviction?

A I do.

Q And there has not been any allegations in his criminal history of failures to appear?

A No, sir.

Q And during your pretrial investigation, did it show that he had significant ties to his family in West Virginia?

A Yes.

Q His siblings, he reported he sees daily; his mother, talks to daily. And he has a child; is that accurate?

A Yes, sir.

Q And with regards to the opiates, he only -- he didn't test positive for Percocets on any of his screens; is that accurate?

A No, not that I'm aware of.

Q And he did say to you that he did have issues with marijuana?

A Yes.

Q And a lot of times, based on your experience, is marijuana a lot of times being laced with fentanyl, and people test positive for fentanyl not even knowing about it?

A I have heard that, yes. People say that when you ask about their use, that it was -- well, it could have been laced and I didn't know it. I have heard that as an excuse.

Q Do you know if he has a passport or anything like that?

A I do not think he does, no.

MR. WILKENS: Thank you. That's all the questions I have.

THE COURT: Other questions?

MS. MACON: One follow-up question, Your Honor.

THE COURT: You may.

REDIRECT EXAMINATION

BY MS. MACON:

Q Officer Rhymer, are you aware that Mr. Headen's sister was charged on the same day in the same conspiracy?

A Yes, ma'am.

MS. MACON: No further questions.

THE COURT: Ms. Rhymer, I think the pretrial reflects that you asked Mr. Headen if he was interested in receiving any substance abuse treatment, and he responded that he was not; is that correct?

THE WITNESS: Yes, Your Honor.

THE COURT: All right. Any further questions for the officer?

MS. MACON: No, Your Honor.

MR. WILKENS: No, Your Honor.

THE COURT: All right. You may step down. Thank you.

THE WITNESS: Thank you.

THE COURT: Further evidence?

MS. MACON: Your Honor, the government relies on the pretrial services report in particular, and Officer Rhymer's testimony that supplements that report with regard to his prior arrests and the conviction on the one drug offense. Also, as noted on page 3 of the pretrial services report, it appears that Mr. Headen uses opioids in a way to evade detection from drug screens while on probation in West Virginia.

I also would like to note for the Court's attention that Mr. Headen apparently does own an aggressive pitbull and pythons.

The government would also rely on the presumption, as well as the affidavit to the criminal complaint. A few portions of the complaint -- bring to the Court's attention paragraph 12, which starts on page 2 and continues on to page 3. It indicates that Mr. Headen sold drugs from the Duke Drive residence, and a witness saw firearms at that residence. And that same paragraph indicates that Mr. Headen was involved in the distribution of significant quantities of methamphetamine. Paragraphs 15 and 16, which begin on page 4, also indicative of

Mr. Headen's involvement in the distribution of significant quantities of methamphetamine. The same for paragraphs 22 and 26, which begin on page 10. Paragraphs 46 and 47 indicate he also -- in addition to distributing significant quantities of methamphetamine -- has been involved in the distribution of fentanyl.

THE COURT: What was the final reference there that you gave?

MS. MACON: Paragraphs 22 and 26.

THE COURT: No, I got that. The next one?

MS. MACON: Page 10 -- oh, I'm sorry. Paragraphs 46 and 47, page 20.

THE COURT: Anything further on behalf of the government?

MS. MACON: I would also bring to the Court's attention paragraph 48, which I believe is on page 21, as well as there's -- on page 25 -- I don't have the paragraph listed for the Court -- subparagraph (g) indicates that Mr. Headen has continued to be involved in the distribution of drugs after June of 2025, meaning he was doing so while he was on probation in West Virginia.

THE COURT: Ms. Rhymer, you testified a moment ago with regard to him being placed on probation on the 2024 charge, but what's the date of disposition? Does it show?

MS. RHYMER: June 26.

THE COURT: June 26 of 2025?

MS. RHYMER: Yes, Your Honor.

THE COURT: Okay. Thank you.

Now, I can put Ms. Rhymer back on the stand and remind her she's under oath, if there's any need to, with regard to that date of disposition.

MS. MACON: No need, Your Honor.

MR. WILKENS: No, Your Honor.

THE COURT: Thank you.

All right. Anything further by the government?

MS. MACON: No, Your Honor.

THE COURT: All right. Mr. Wilkens, evidence?

MR. WILKENS: Your Honor, I call Olivia Brown.

THE COURT: You what? I'm sorry?

MR. WILKENS: I call Olivia Brown as a witness.

THE COURT: Okay. Ma'am, if you'll step forward right up here to the witness stand and raise your right hand to be sworn, please.

OLIVIA BROWN, CALLED BY THE DEFENSE, SWORN

THE COURT: If you'll have a seat there on the witness stand and answer the questions of counsel, please.

DIRECT EXAMINATION

BY MR. WILKENS:

Q Can you please state your name for the record?

A Olivia Brown.

Q Okay. And how is it that you know my client, Terry Headen?
A That is my boyfriend.
Q And how long have you been together with him?
A For three years.
Q Okay. During that time, do you feel like you've gotten to know him pretty well?
A Very well, yes.
Q Okay. Can you tell the Court a little bit about his -- where he lives?
A He's currently residing in Welch, West Virginia.
Q And how long has he been in that community?
A From what I know of, since he was born.
Q Okay. Have you -- during this time, have you had an opportunity to meet his family?
A Absolutely.
Q Can you tell the Court, like, his mom, siblings, what you know about them?
A Yeah, his mom is great. She's got two kids that are at home by herself with her. I mean, she's also got an older sister and younger sister as well. The younger sister is in college right now, doing great. He also has a son as well that he is very tied in with every single day.
Q How old is his child?
A Two years old.

Q Okay. And you say that -- does he have custody of the child?
A No, not custody. And it's never really been taken to court for that. He just see him every day. Him and the baby mother are no longer together.
Q So they broke up and then he just keeps the kid --
A Right.
Q About how often does he keep the kid? You say he sees him every day.
A It just depends on what the baby mother's plans are. So just as often as he can, honestly.
Q Okay. And does he keep up with his family and siblings?
A Yes, 24/7. They'll probably say that he's annoying just because of that.
Q Okay. And are they in that community --
A Yes.
Q -- or are they spread out?
A No, they're also from Welch as well.
Q Okay. Does he have any significant ties to other states, to your knowledge?
A No.
Q And where do you live?
A In Princeton, West Virginia.
Q And what is your occupation?
A I'm an orthopedic nurse.

Q Are you familiar with Terry's criminal history?
A No.
Q Okay. And so are you aware that he is on probation?
A Yes, I am aware of that.
Q Okay. Does he keep up with his probation?
A Yes, very well, to the T.
Q If the Court saw fit to grant him a bond and put conditions on him, such as reporting to a pretrial officer, taking drug screens and stuff like that, do you think that he would be able to be in compliance with that?
A Absolutely. He's never had any failure of appearing to things like that.
Q Okay. Do you know if my client has a passport? Is he able to flee the country?
A He does not have a passport.
Q Do you know if he has any failures to appear?
A No. I do know that he does not have any failures to appear, absolutely.
Q Okay. Now, you heard the testimony that he's -- he does marijuana. Have you seen him do marijuana?
A Yes. He has a medical card for it.
Q Okay. And then also there was some issues with Percocet.
A I will just say that as of November of last year, he actually reached out to me for help in regards to having an addiction to Percocet to get him some rehab or something like

that.
Q Okay. And you also heard the testimony that he's recently tested positive for fentanyl. Did you know anything about that?
A I heard that. I did not know anything about that, no.
Q Do you -- do you think that he could benefit from a rehab or -- to address these addiction issues?
A I do absolutely think that he could benefit from something like that. Like I said, I was actually at Thanksgiving with my family whenever he had called to reach out for help just because he couldn't be around his family in the state that he was in. And I can only do so much from not being in that type of field. So I do believe that he can get further help with a drug rehabilitation center for sure.
Q Now, do you know if my client has a driver's license?
A He does.
Q Okay. Do you understand that if Court saw fit to grant him a bond, he's going to have to appear in Abingdon, Virginia?
A Correct.
Q Approximately how far away is that?
A From me, from Princeton -- because he's not going back to Welch -- it would be an hour and 20 minutes.
Q So you're intending to have him live with you?
A Absolutely.
Q Okay. How long was it again?

A An hour and 20 minutes.
Q An hour and 20 minutes?
A Yes. It honestly just depends on the way you take. I think there's a shorter way too.
Q Okay. And so you think he would be able to appear in this court?
A 100 percent.
Q And do you think he would also be willing to cooperate with his attorney to investigate this case and litigate it?
A Absolutely. Willing to communicate as many times as we have to.
Q Now, it's also my understanding that my client doesn't have a job currently?
A Not currently, no, sir.
Q What was he looking into doing prior to getting arrested?
A Welch, West Virginia is really big on, like, ATVs, and Hatfield-McCoy are really big right there. So our plans were to rent out properties for that, whether it's a camper, whether it's trailers, houses, whatever it is.
Q So to acquire real estate --
A Yes.
Q -- and rent it?
A Yes.
MR. WILKENS: That's all the questions I have. Thank you. The other side will have questions.

THE COURT: Ms. Macon, questions?

MS. MACON: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. MACON:

Q Good morning, Ms. Brown.

A Good morning.

Q What is your relationship to Mr. Headen?

A This is my boyfriend.

Q How long have you known Mr. Headen?

A I've known him for a while, not really close to knowing him, but we've been together for three years. So I would say about three or four years.

Q Have you been living with Mr. Headen?

A No.

Q Do you see him regularly?

A Pretty often.

Q How often?

A It just depends on the week, really. I work during the week. So pretty much on the weekends is basically whenever we would have our sole time together.

Q Were you aware that Mr. Headen was involved in selling drugs?

A No.

Q You were aware he was using drugs?

A Yes. Not until, like I said, a year ago, whenever he had

reached out for help.
Q Have you ever been a drug user?
A No.
I smoke marijuana. I have my medical card for that as well.
Q You do smoke marijuana?
A Yes, correct.
THE COURT: What's the condition that you smoked it for?
THE WITNESS: I had cancer.
THE COURT: You had cancer?
THE WITNESS: Yes, ma'am. I don't smoke it now. That's what I have the medical card for, yes.
BY MS. MACON:
Q When is the last time you used marijuana?
A What is today? October. Probably August.
Q When were you diagnosed with cancer?
A November of 2024.
Q Are you still undergoing treatment for cancer?
A Every six months. I'm just backing up to see if it's there or not.
Q What type of cancer?
A Cervical and ovarian.
Q Who is Sho?
A Who is Sho? I'm not for sure who Sho is. Do you have

another name?
Q Did you receive a call about needing to remove something from Mr. Headen's safe?
A From Sho?
Q From anyone?
A Yes, I have.
Q When was that?
A Whatever day that they picked him up.
Q So it was after his arrest?
A Correct.
Q Did you remove that something from Mr. Headen's safe?
A No, ma'am. I do not have access to it.
Q Who asked you to remove something from Mr. Headen's safe?
A There's been multiple people.
Q Who are those people?
A His uncle, his cousins, sisters.
Q What are their names?
A I could not tell you their actual names. I know I've got a Bubba. I'm not really for sure what his real name is. Like I said, I'm not really familiar or tied in with that side of the family.
Q What did they ask you to remove?
A They just said, Can we get into the safe? That's it.
Q They didn't ask you to remove something specific?
A No, ma'am.

THE COURT: Where is the safe we're talking about, ma'am? Do you know, Ms. Brown?

THE WITNESS: At his house, I'm assuming.

THE COURT: Okay. It's not at your home?

THE WITNESS: No. Like I said, we don't live together.

BY MS. MACON:

Q I believe you mentioned being employed. How are you employed?

A I'm an orthopedic nurse.

Q Is that a full-time position?

A It is.

Q What are your work hours?

A I work Monday through Friday, 8 to around 6, 6:30. It just depends on when the patients are out of there.

Q And it's an in-person job?

A Correct. We also do a walk-in clinic. So it just depends on when patients are in and out of there as well.

Q So it's fair to say you're not at the house during those working hours?

A No.

Q So you won't be able to monitor Mr. Headen while you're at work; is that --

A Correct, yeah.

Q Do you have a criminal history?

A No, ma'am.
Q Do you have any firearms?
A No, ma'am.
Q Any prescription pain medicine?
A No, ma'am. Not currently, at least.
Q Any children in your home?
A No, ma'am.

Q You mentioned Mr. Headen didn't have a job; is that correct, prior to his arrest?
A Correct.
Q Do you know how he was able to afford his vehicles?
A No idea. Like I said, I have no idea about his history before we met.
Q So you've known him for -- you've been together for three years?
A Four years, yeah. Well, three years, yeah. I've known him for about four, correct. But he's had all this before we got together, so.
Q He's had a side-by-side for over four years?
A I don't know how long he's had that.

THE COURT: A moment ago you testified that you all's plan was to acquire property, but Mr. Headen has never been employed. How would he come about with money to allow you all to acquire property?

THE WITNESS: My family -- like I said, my family is from Princeton, West Virginia. My grandmother has beaucoup of land in Oakvale, West Virginia, which is currently where I'm building a house in Princeton. There is multiple houses there that are abandoned that you can do all kinds of things with, whether it's trailers, houses.

THE COURT: My question is where would he get any money to invest in that?

THE WITNESS: Oh, I guess he would have to find a job eventually. But, I mean, that's what I'm here for. That's what I was doing.

THE COURT: Do you ever know of him working?

THE WITNESS: Not that I've known him, no, ma'am.

MS. MACON: Brief indulgence, Your Honor.

THE COURT: You may.

MS. MACON: No further questions.

THE COURT: Further questions, Mr. Wilkens?

MR. WILKENS: Just one.

THE COURT: You may.

REDIRECT EXAMINATION

BY MR. WILKENS:

Q If he was in your home and he was using illegal drugs or if you were concerned, would you contact and turn him in?

A Absolutely.

THE COURT: Ma'am, you said that you and the

defendant have been together for three years; is that correct?

THE WITNESS: Correct. Yes, ma'am.

THE COURT: All right. And you said you thought you knew him well?

THE WITNESS: Yeah, for the past, yeah, maybe three years. Yes, ma'am.

THE COURT: Have you seen the affidavit attached to the criminal complaint in this case?

THE WITNESS: No, ma'am. I'm not even quite sure what that is.

THE COURT: All right. So you haven't fully read the allegations against him?

THE WITNESS: No, ma'am.

THE COURT: Are you aware that there is evidence showing that he has distributed pounds of methamphetamine --

THE WITNESS: No, ma'am.

THE COURT: -- that have come into southwest Virginia over the past couple of years?

THE WITNESS: No, ma'am.

THE COURT: So you sit here before the Court and you're telling the Court that you are not aware of any of this evidence?

THE WITNESS: No, ma'am. He's -- like I said, he's done pretty -- he kept the whole him being with that addiction for quite some time without me knowing, so.

THE COURT: Well, he's not claiming he's addicted to methamphetamine, is he?

THE WITNESS: Yeah, I hope not.

THE COURT: Well, I mean, he didn't tell you that, did he?

THE WITNESS: Right.

THE COURT: Okay. Have you been in the residence that's located on Duke Drive? I believe it's like 65 Duke Drive.

THE WITNESS: I don't know where that's at. Is it Princeton or Welch?

THE COURT: In Welch?

THE WITNESS: No, ma'am.

THE COURT: Never gone there with Mr. Headen?

THE WITNESS: No, ma'am. I'm not familiar with the street addresses in Welch. Like I said, I'm not from there. It's about an hour or so away from my home.

THE COURT: Ever seen Mr. Headen with a firearm?

THE WITNESS: No, ma'am.

THE COURT: Now, a moment ago you said you knew that if he was placed on supervision that he would comply with his conditions of supervision; is that correct?

THE WITNESS: Yes, ma'am.

THE COURT: But you've heard the testimony here today that he admits he's not been complying with his conditions of probation in West Virginia?

THE WITNESS: That I'm unaware of.

THE COURT: You didn't hear the testimony that he's been testing positive?

THE WITNESS: Yes, I know that he's -- went to a pee test with him, but I was unaware that it was positive.

THE COURT: And I take it you were unaware that he's admitted that he has used while he's on probation?

THE WITNESS: Correct.

THE COURT: You said you believed he'd benefit from rehab, but you heard the officer's testimony here today that he's told her he's not interested in it?

THE WITNESS: Correct, I did hear that.

THE COURT: And you said he reached out for help last Thanksgiving?

THE WITNESS: Yes, ma'am.

THE COURT: And to date, he hasn't gone into any type of rehab or treatment, has he?

THE WITNESS: Right. No, ma'am.

THE COURT: I assume that during that period of time you've encouraged him to do so?

THE WITNESS: Absolutely. I believe one of the things that's kept him from that is because he will be away

from his son. And like I said, that is a daily thing that he does is go and see his son. That is his pride and joy, his motivation to absolutely do anything. So I feel like that's kind of why he was putting that off as long as he could.

THE COURT: Any further questions of the witness?

MS. MACON: Yes, Your Honor.

THE COURT: You may.

FURTHER CROSS-EXAMINATION

BY MS. MACON:

Q Ms. Brown, do you know Chuck Williams?
A No, ma'am.
Q How about Taylor Headen?
A Yes.
Q How do you know Taylor?
A That is his sister.
Q How often do you see Taylor?
A Not very often.
Q What's not very often?
A I see her maybe once every couple of months.
Q Do you communicate with her?
A No.
Q Have you ever received any Cash App funds from Mr. Headen?
A Mr. Headen? Yes.
Q How often do you receive those funds?
A Not very often.

Q What's not very often?
A I haven't in probably a year and a half or two years.
Q Do you know where he got that money?
A No.
Q You don't know?
A No.
Q You do understand you're under oath, correct?
A Correct, yes.
Q Knowing that, is there anything that you've said today that you need to clarify or correct?
A No, ma'am.

MS. MACON: No further questions.

THE COURT: Mr. Wilkens, anything further?

MR. WILKENS: I don't have anything further, Your Honor.

THE COURT: All right, ma'am. You may step down. Thank you.

THE WITNESS: Thank you.

THE COURT: Further evidence, Mr. Wilkens?

MR. WILKENS: No, Your Honor.

THE COURT: All right. Any evidence in rebuttal from the government?

MS. MACON: Yes, Your Honor. The government would call Special Agent Cody Vines.

THE COURT: All right. Sir, if you'll step around to

be sworn.

BRANDON CODY VINES, CALLED BY THE GOVERNMENT, SWORN

THE COURT: Have a seat and answer the questions of counsel, please.

DIRECT EXAMINATION

BY MS. MACON:

Q Good morning, Agent Vines. Please state your name.
A Special Agent Brandon Cody Vines.
Q Agent Vines, have you been involved in the investigation of Terry Headen?
A I have.
Q Following Mr. Headen's arrest a couple weeks ago, has law enforcement listened to jail calls?
A Yes.
Q Would those jail calls involve Mr. Headen?
A Yes.
Q Now, you didn't personally listen to this jail call; is that correct?
A I did not.
Q But you've heard about this from other agents involved in this case?
A Yes.
Q If you could --

MR. WILKENS: Your Honor, I think I would object. That would be hearsay.

THE COURT: It's allowed at this proceeding. That will be overruled.

MR. WILKENS: Okay.

BY MS. MACON:

Q Is there a particular jail call of note that law enforcement has listened to?

A There was a jail call with an individual, based off of my conversations with other law enforcement, that they believe that individual was Ms. Olivia Brown and Terry Headen.

Q And what were the contents of that communication?

A That Sho -- an individual known as Sho was asking Ms. Brown about a safe that Mr. Headen had, and about getting into that safe and getting the contents out of there. And Mr. Headen had advised her, basically, not to give anything to Sho, and that there was some stuff in the safe. And he had told her to keep some of it.

THE COURT: Now, I'm sorry. I'm a little confused. So let's back up a moment.

Was there one conversation you're talking about between three parties, or was this conversation just between someone who you think was Ms. Brown and you know was Mr. Headen?

THE WITNESS: It was one telephone call between Mr. Headen and an individual we believe to be Ms. Brown.

THE COURT: All right. And in that telephone call,

she says somebody named Sho approached her about getting into the safe, or he says do not let Sho into the safe?

THE WITNESS: Your Honor, I can't recall specifically if it was Sho that asked to get into the safe or Mr. Headen had asked her about Sho getting into the safe, but what I can say is that they talked about the safe. And he said that Sho was looking -- I can't recall what he was saying about trying to get into the safe specifically. But I am sure that Mr. Headen had a safe, and she controlled the contents of that safe based off from what I've heard from other law enforcement, and that Terry told her to -- do not let Sho have whatever was in the safe, and for her to keep what was in the safe. And I think there was some code words. He mentioned a ten-pack, if I'm not mistaken, and then there was a chain in there. But as to the content specifically, I can't say what was in the safe, other than there was a safe, and he told Ms. Brown to keep whatever was in the safe and not give it to Sho.

MS. MACON: No further questions, Your Honor.

THE COURT: Has anyone checked to see what the phone number was? I know to make jail calls to a particular phone number, I think you have to register them so that you know what the phone numbers are.

THE WITNESS: I think based off the totality of all that is how it has led to the belief that it was Ms. Brown.

MS. MACON: Thank you, Your Honor. No further

questions.

THE COURT: Mr. Wilkens, questions of the agent?

CROSS-EXAMINATION

BY MR. WILKENS:

Q So you only believe that the phone number was registered to Ms. Brown. You didn't hear her voice, or anything like that, with regards to this?

A I have not heard the telephone call. I have not did the research to confirm that it was or was not Ms. Brown. I'm just going off of information that was shared for me from other law enforcement.

Q Okay. And so to your knowledge, there is no evidence on what was in the safe?

A I have no knowledge specifically of what was in the safe.

Q And you -- there was nothing in that conversation that would indicate that my client gave her the code to the safe or let her know where the key to the safe was?

A I'm not aware of that. I think Ms. Brown did say that she received a call about the safe while she was on the stand. So that would kind of corroborate the information from law enforcement as far as who was on that telephone call. But I have no information about what was in the safe, other than what was said on the call. It wasn't specifically described.

Q She testified that she -- that a person called Sho talked to her. My client is not Sho; isn't that accurate?

A Right.

MR. WILKENS: That's all the questions I have.

THE WITNESS: Yes, sir.

THE COURT: Agent Vines, you're with ATF, correct?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. Do you know whether or not, after his arrest, Mr. Headen made any statements with regard to the charges against him?

THE WITNESS: I'm the one that actually transferred him. So he was arrested in McDowell County by the Sheriff's Office. I'm the one that went and picked up Mr. Headen. I read him his rights when I picked him up, and he chose to speak with his attorney before we discussed anything. We had a general conversation on the way here, but it was -- I did not direct anything specifically to him about the case.

THE COURT: Anything further of the witness?

MS. MACON: No, Your Honor.

MR. WILKENS: No, Your Honor.

THE COURT: Mr. Vines, are you aware of any evidence that shows -- other than the safe conversation, any evidence that shows Ms. Brown played any role in the crimes that Mr. Headen is accused of?

THE WITNESS: I do recall -- I have analyzed Mr. Headen's Cash App account. I do recall there being numerous transactions to an individual identified as Liv Brown,

I think, on the Cash App, who I believe could possibly be Olivia Brown. But other than that, I have no reason to believe at this point that she is involved, other than seeing money transfers.

THE COURT: Anything further of the witness?

MS. MACON: No, Your Honor.

MR. WILKENS: No, Your Honor.

THE COURT: All right. You may step down. Thank you.

Further evidence?

MS. MACON: No evidence, Your Honor.

THE COURT: Argument?

MS. MACON: Yes, Your Honor. Thank you.

Your Honor, Mr. Headen should remain detained pending trial as there is no condition or combination of conditions that will reasonably assure the safety of any person and the community. As the Court knows, this is a presumption case, and Mr. Headen has not offered evidence substantial enough to rebut the presumption here.

The statutory factors weigh in favor of detention. The weight of the evidence is strong, as is indicated in the affidavit to the criminal complaint. Numerous witnesses detail substantial drug transactions with Mr. Headen.

THE COURT: Have you done any summary of the actual poundage of methamphetamine that's alleged in the complaint?

MS. MACON: I don't have a combined summary. I know several witnesses have said that they picked up multiple pounds at a time, but I don't have that for the Court. Facebook messages also corroborate Mr. Headen's substantial involvement in methamphetamine trafficking, as well as the distribution of fentanyl, as do the Cash App records that are mentioned in the affidavit to the criminal complaint.

Relatedly, the nature and circumstances of the offense charge weigh in favor of detention. Again, the evidence, as laid forth in the affidavit, indicate that Mr. Headen is a major methamphetamine dealer, and is also involved in dealing fentanyl. And this Court is well aware of the dangers of both of those drugs.

As to Mr. Headen's history and characteristics, he has the one drug conviction, as well as arrest, for another drug offense. Moreover, as came out in testimony today, and as indicated in the pretrial services report, Mr. Headen was on probation during at least a portion of the conduct described in the affidavit to the criminal complaint. And he admitted to deceiving or attempting to deceive probation in terms of taking opiates at particular times to avoid detection on drug screens.

I'd also like to note that although there is some evidence that Mr. Headen is a drug user of some sort, it does not appear to be the case where Mr. Headen is a meth addict who is feeding his habit. He does not report using meth and has

not tested positive for methamphetamine, at least while West Virginia probation has tested him, at least on the reports that our probation officer here has received from West Virginia.

It also appears that Mr. Headen has profited substantially from his conduct. He reports he's never been employed. His girlfriend testified that he has not been employed. And yet, according to the pretrial services report, he has both a vehicle and a side-by-side that appear, at least per his reports, to be worth quite a bit of money.

The government also submits that Ms. Brown is not an appropriate third-party custodian. I know she reported that she does not live in Welch, West Virginia, but she is certainly close to the community in which Mr. Headen has operated his drug conspiracy. She also works full-time and is not at home to monitor him on a regular basis. And, Your Honor, to be frank, the government is concerned, based on the testimony of the agent, in terms of the jail call in which -- and her testimony -- about needing to remove something from Mr. Headen's safe.

So for those reasons, the government submits that Mr. Headen should remain in custody pending his trial. Thank you, Your Honor.

THE COURT: Mr. Wilkens?

MR. WILKENS: Your Honor, respectfully, we believe that we have been able to rebut the presumption. He has

significant ties with his family and his child. He sees them daily. He also has a girlfriend who is employed and does a very fine job for herself. And we believe that she is an appropriate custodian to -- upon his release. She testified that if he was using illegal drugs or doing anything dangerous, that she would report him to the appropriate authorities.

My client does not have a significant criminal history, although it does have a tendency to show that he has a drug issue. And that has also been able to show on his drug screens, especially the last two, with regards to the use of fentanyl. And so we believe that my client does have a -- I believe my client has a drug issue that he needs to address, and being able to go to a rehab facility would be an appropriate place. And he has reached out to her with regards to his drug abuse, and also indicated to her that he would be willing to do a rehab facility. And so I think that that would be appropriate.

He also shows up to his court proceedings. So he doesn't have any failures to appear. He has the ability to get to communicate with his attorney down in Big Stone Gap, Virginia, and also he'll show up to court like he's supposed to. He has a driver's license, and he does have a vehicle. And so we believe that he would be able to do that, and as well as be able to report to a pretrial officer with regards to that. He also does not have a passport. So there is not a

significant flight risk with regards to this. He's also never been charged with anything federally.

And so we believe that the Court should take that into consideration grant and him a bond. Thank you.

THE COURT: Anything further from the government?

MS. MACON: No, Your Honor.

THE COURT: Mr. Headen, if you'll stand so that I might address you, sir.

Mr. Headen, the charges that you face are very serious charges. They carry a presumption of detention. Based on the evidence that I've heard here today, I would find that you failed to rebut that presumption of detention. Regardless of the presumption, I would find that the evidence before me shows by the clear and convincing standard that you are a danger to the community or others if released. Now, I know you have contacts in the Welch, West Virginia area. And I'll be blunt. I'm not sure that risk of flight is really an issue here, although it's clear that you have access to an incredible amount of funds by which you could procure absconding. But the real issue here is the weight of the evidence is significant in this case. And the weight of the evidence that's before the Court is that you have been distributing pounds of methamphetamine for a couple of years each week. Not just pounds; each week, pounds.

The other distinguishing factor here is the best

indication I have of how you will do on supervision is how you have done on supervision. You're currently on probation, and you've continued -- the evidence before me is that you've continued distributing and using drugs yourself on probation. It doesn't make it likely that there are any conditions or combination of conditions I could impose upon you that you're likely to abide by.

So, Mr. Headen, my order will be that you will be detained pending your trial. Now, you can speak to Mr. Wilkens about this. You do have a right to appeal my detention order to a district court judge pending your trial.

Counsel, is there anything further I need to take up in the case today?

MS. MACON: No, Your Honor.

MR. WILKENS: No, Your Honor.

THE COURT: If not, then the Court will stand on recess.

(Proceedings concluded, 11:48 a.m.)

C E R T I F I C A T E

I, Lisa M. Blair, RMR/CRR, Official Court Reporter for the United States District Court for the Western District of Virginia, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/s/ Lisa M. Blair Date: November 10, 2025