IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

- - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA, )
)
v. ) CRIMINAL ACTION NO.
) 1:25cr49
AMANDA HORTON, )
)
Defendant. )
)

- - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS

(INITIAL APPEARANCE, ARRAIGNMENT & BOND HEARING)

Abingdon, Virginia

June 25, 2026

BEFORE: THE HONORABLE PAMELA MEADE SARGENT
United States Magistrate Judge

APPEARANCES:

COUNSEL FOR THE UNITED STATES:

UNITED STATES ATTORNEY'S OFFICE
By: Carrie Lee Macon
180 W. Main Street, Suite B19
Abingdon, VA 24210

COUNSEL FOR THE DEFENDANT:

LAW OFFICE OF PATRICK J. KENNEY
By: Patrick Jon Kenney
P.O. Box 599
Roanoke VA 24004

I N D E X

GOVERNMENT'S WITNESSES PAGE

AGENT STEPHEN LEVESQUE
Direct Examination by Ms. Macon 10
Cross-Examination by Mr. Kenney 13
Redirect Examination by Ms. Macon 14
Further Redirect Examination by Ms. Macon 17
Recross-Examination by Mr. Kenney 17

DEFENDANT'S WITNESSES PAGE

AMANDA HORTON
Direct Examination by Mr. Kenney 22
Cross-Examination by Ms. Macon 25
Recross-Examination by Mr. Kenney 28

(Proceedings commenced at 9:02 a.m.)

THE COURT: Good morning. The Court has before it this morning the case of United States of America v. Amanda Horton. It's case number 1:25cr49. Ms. Horton is defendant number 4 in the case. Ms. Horton is before the Court today for an initial appearance, arraignment, and bond hearing.

Ms. Horton, if you'll stand so I might address you, ma'am, with counsel. Ms. Horton, my name is Judge Sargent. I'm the magistrate judge here in Abingdon. In just one moment what I'm going to do, ma'am, is I'm going to go over the charge contained against you in a superseding indictment that was returned in this case on the 23rd. After I go over that charge, ma'am, I'm going to ask you if you understand what you're charged with.

Now, I want to caution you, I'm not going to ask you to make any statements regarding the charge, and you are to understand that if you voluntarily make any statements regarding the charge, those statements can be used against you. As I said, the only question I'm going to put to you is do you understand the charge, and you're not prejudiced in any way by answering that question.

After I go over the charge with you, I'm going to turn the proceedings over to Ms. Macon of the U.S. Attorney's Office. She's going to ask you perhaps some identifying questions. She's then going to advise you with regard to the

charges you face and the mandatory minimums and maximum sentences of the charges you face if you should be convicted of those charges. The Court will then take your formal plea to the charges. After that, we'll take up the issue of bond.

Now, as I said, you have been charged in a superseding indictment that has been entered in this case or was returned in this case on or about June 23rd. That superseding indictment charges multiple defendants and it has multiple counts, however, you are charged only in one count of that superseding indictment.

You, ma'am, are charged in Count I with violating Title 21, United States Code, Sections 846, 841(b)(1)(A), and 851, and that is a charge of conspiracy to possess with intent to distribute and to distribute 500 grams of more of a mixture or substance containing a detectable amount of methamphetamine. The remaining two counts of the indictment, the superseding indictment, you're not charged in.

There is a notice of forfeiture contained in the superseding indictment, and that notice of forfeiture claims that certain particular rounds of ammunition and a firearm should be forfeited to the United States government as either being used in the commission of criminal activity or being the proceeds of criminal activity.

Now, Mr. Kenney, have you had a chance to go over the charging superseding indictment with your client?

MR. KENNEY: I have, Your Honor.

THE COURT: And, Ms. Horton, do you understand what you're charged with in the indictment?

THE DEFENDANT: Yes.

THE COURT: All right. If you'll direct your attention to Ms. Macon at this time.

Ms. Macon.

MS. MACON: Thank you, Your Honor.

Ms. Horton, please state your full name.

THE DEFENDANT: Amanda Gail Horton.

MS. MACON: And the last four digits of your social security number?

THE DEFENDANT: 4014.

MS. MACON: Your date of birth?

THE DEFENDANT: [redacted]77.

MS. MACON: And your address?

THE DEFENDANT: [redacted] Raven, Virginia [redacted].

MS. MACON: Mr. Kenney, is your client waiving formal reading of the indictment?

MR. KENNEY: Yes.

MS. MACON: Ms. Horton, as the Court informed you, the grand jury indicted you on or about June 23, 2026. The indictment includes one count against you.

Count I charges that you knowingly or intentionally

conspired with others to possess with the intent to distribute and distribute 500 grams of more of a mixture or substance containing methamphetamine in violation of 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A). The 851 charge or citation does not apply to Ms. Horton.

The mandatory minimum term of imprisonment associated with that count is ten years, maximum term of imprisonment is life, maximum fine of $10 million, and a period of supervised release of at least five years. The indictment also contains a notice of forfeiture, and the count also carries a $100 mandatory special assessment.

Finally, if you violate the terms of any period of supervised release, it may increase the original term of your imprisonment.

THE COURT: Thank you.

MS. MACON: Thank you, Your Honor.

THE COURT: Ms. Horton, now knowing the charge against you and the penalties that may be imposed should you be convicted of that charge, how do you wish to plead to the charge, ma'am?

THE DEFENDANT: Not guilty.

THE COURT: All right. I understand that you're pleading not guilty to the charge contained against you in the indictment.

This case has been pending for a while. I'm surprised, but it has not been set for trial, even with the three original defendants who are in the case?

MS. MACON: It has been set, Your Honor. It's the end of October, the last week of October.

THE COURT: All right. I would suspect that that trial date is going to be questionable, but I just want to make sure -- do you have the dates there that it is? Do you remember?

MS. MACON: I know it's Halloween week. I can pull up the specific dates right now. It's set for the full week, I believe, or at least four days. October 26th through the 30th.

THE COURT: Okay. I just want to make everybody aware of that because, Mr. Kenney, if you do not believe you can be prepared to try it within that period of time, of course it's going to take a motion to continue that Judge Ballou would hear.

MR. KENNEY: Yes, ma'am.

THE COURT: I do have a Waiver of Speedy Trial form here today. I would just ask that if you believe your client is going to waive her speedy trial rights after discussing them with you and that would be the basis of your motion to continue the trial that's set, I would ask that you execute this form and put it on file with the court.

MR. KENNEY: We have to problem with that, judge.

THE COURT: Okay. Give him the form.

Let me just advise you, ma'am, so that you can speak to Mr. Kenney about this, you do have a right to have your case tried within a certain period of time under the Speedy Trial Act and the Speedy Trial Clause of the United States Constitution. Under the Speed Trial Act it's approximately 70 days from your court appearance.

Now, there are a lot of things that affect that timing, and in this case there are a couple of defendants that are not in custody, so it would actually be 70 days from the time that the last defendant comes before the court. So technically it hasn't even started to run yet, but you do have a right to have your trial within that period of time.

Many times in cases like this, drug conspiracy cases, defense counsel believe they need additional time to be prepared to try the case. That's not unreasonable, okay? But I just want to make sure that you understand you do have the right to have your case heard within a certain period of time. Do you understand that?

THE DEFENDANT: (Witness gave non-verbal response.)

THE COURT: Now, I need you to answer out loud yes or no, please.

THE DEFENDANT: Yes.

THE COURT: The reason I need to make sure your

voice is audible is I don't have a court reporter. We actually record the proceedings, and I have to make sure your voice is audible on the recording.

After you consult with Mr. Kenney, if you're willing to waive that right and have your case set outside that period of time, we have that waiver form there. You can execute that, and we'll put it on file with the court. That just helps the court because if your counsel is going to move to set it later, the court is going to ask to have that waiver on file to do so.

THE DEFENDANT: Okay.

THE COURT: Do you have any questions about that, ma'am?

THE DEFENDANT: No.

THE COURT: All right. Let me ask, what is the government's position with regard to bond?

MS. MACON: The government seeks detention, Your Honor.

THE COURT: All right. Is the government prepared to go forward with that today?

MS. MACON: Yes, Your Honor.

THE COURT: Mr. Kenney, are you prepared to go forward with a detention hearing today?

MR. KENNEY: We are, Your Honor.

THE COURT: All right. Ms. Horton, if you'll have a

seat there at counsel table, I'll have the government present whatever evidence it would like for me to consider, and then your counsel will have an opportunity to present evidence on your behalf.

Ms. Macon.

MS. MACON: Thank you, Your Honor. The government calls Special Agent Stephen Levesque to the stand.

THE COURT: All right. Sir, if you'll step around and be sworn.

STEPHEN LEVESQUE, called by the Government, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. MACON:

Q. Good morning, Agent Levesque. Please state your name and title.

A. My name is Steven Levesque. I'm a special agent with the ATF.

Q. Have you been involved in investigating Ms. Horton and others?

A. Yes.

Q. Was Ms. Horton originally subpoenaed to testify before the grand jury?

A. She was.

Q. And you were not present for the day she was subpoenaed to testified before the grand jury; is that correct?

A. That's correct.
Q. But at some point is it your understanding that she was called back or allowed to -- given an opportunity to come back?
A. Yes.
Q. Were you present for that day?
A. I was.
Q. Can you give the Court a brief overview of what happened on that day for which you were present?
A. It's my understanding that Ms. Horton consulted with an attorney in between the two grand jury dates and decided to come back to grand jury.
We didn't get to her in the morning session of the grand jury, and we were taking a lunch break. So we advised her that she needed to come back after lunch. She said, well -- she said she wasn't testifying. And we said, Well, we still need you to come back after lunch, and she did not come back after lunch.
Q. Were you also present for Ms. Horton's arrest that occurred yesterday?
A. Yes.
Q. Was Ms. Horton cooperative?
A. She was not.
Q. Can you explain what happened?
A. We came to the residence and knocked on the door. Her

husband came to the door, and we told her husband we needed to speak with Amanda. He asked us what was going on, and we said, "We need to speak with Amanda."

He said, if you guys -- we told him we didn't want to come in the house, we just needed her to come out to the front porch. And he told us that if we came in the house, that we would have a shootout with him.

So we backed up a little bit. Then he came out the door again, repeated some of the same threats, and this went on. We had to call backup. This went on for about 25 minutes before we even saw Ms. Horton for the first time in the window.

They kept saying -- let me back up. We knew that one of their mothers lived next door, so another agent went next door and was able to get Mr. Horton on the phone. Mr. Horton continued to say that he was ready to shoot agents, and he was ready to do what he needed to do.

We had previously advised Mr. Horton and over the loudspeaker that there was a federal arrest warrant for Ms. Horton, so it was very clear even before he made those statements.

Ms. Horton and Mr. Horton continued to come to a window and open the window and tell us that they were coming out. Every ten minutes they would come and say the same thing. It almost seemed like they were delaying something.

We had additional marked units arrive to the scene. We were getting ready to call the SWAT team. So after about I believe it was 40 or 45 minutes Ms. Horton finally came out of the residence, and we were able to put her under custody.

MS. MACON: Thank you. No further questions.

CROSS-EXAMINATION

BY MR. KENNEY:

Q. No weapons were brandished?

A. Not by Mr. or Mrs. Horton, no.

Q. Okay.

THE COURT: Mr. Kenney, it's the tradition in my court you stand, sir. Thank you.

MR. KENNEY: Pardon me, Your Honor.

THE COURT: That's okay.

BY MR. KENNEY:

Q. At any time when you saw the individuals at the window, did you see any type of weapons whatsoever other than firearms?

A. We did not.

Q. And then when my client came out of the home, I'm assuming it was without incident at that point?

A. That's correct.

Q. All right. She didn't try to fight you? She didn't try to shrug you off or anything of that nature?

A. She wasn't -- once I had her in handcuffs and I was

trying to -- at that point, Mr. Horton was not in custody at the time, and the tensions were still high. I was trying to move her behind a vehicle, and she wasn't walking with me, and I was trying to give her verbal commands. I had to use a little bit of force to get her behind the vehicle for cover for her safety.

MR. KENNEY: All right. I don't have any other questions. Thank you.

MS. MACON: Briefly, Your Honor, if I may.

REDIRECT EXAMINATION

BY MS. MACON:

Q. Did law enforcement come to learn that there are firearms at Ms. Horton's residence?

A. Yes.

Q. Any additional details other than just the fact there are firearms; do you recall?

A. After Mr. Horton was Mirandized, he made a statement that he had a 9mm and several .22 caliber, I don't know if it's pistols or rifles, in the house.

Q. And that's the residence in which both Ms. Horton and Mr. Horton reside?

A. Yes.

MS. MACON: No further questions, Your Honor.

THE COURT: Agent Levesque, during this kind of standoff, how long was it before you even spoke -- any of the

agents there spoke with Ms. Horton?

THE WITNESS: At least 30 minutes.

THE COURT: Okay. And when you first went there, it was clear when you spoke to Mr. Horton that you were looking for Ms. Horton, Amanda Horton, correct?

THE WITNESS: Correct, yes.

THE COURT: All right. When she -- I think you said that she eventually came to a window and had some kind of conversation with the officers. Was that with you?

THE WITNESS: I was present during some of the discussion, yes, ma'am.

THE COURT: Okay. What did she say when she came to the window?

THE WITNESS: She said that she was coming, that she had just got out of the shower, that she was combing her hair.

Then a separate time, maybe 10 or 15 minutes later after that conversation, we said, "No, you need to come out now." And she said, "I'm talking to my children on the phone." Then it was another 10 or 15 minutes before she actually came out.

THE COURT: So at first she told you she had just gotten out of the shower?

THE WITNESS: Yes.

THE COURT: As if she had gotten in the shower after

y'all had arrived at the home?

THE WITNESS: That's what it seemed like, yes, ma'am.

THE COURT: Because you said it was approximately 30 minutes after you arrived before you ever saw her?

THE WITNESS: Correct.

THE COURT: After her arrest, did she make any statements to you or any statements that you're aware of regarding why she didn't simply come out of the home or why the delay?

THE WITNESS: No.

THE COURT: Did the agents go into the home?

THE WITNESS: We did not.

THE COURT: Because eventually both Ms. Horton and her husband came out and were placed in custody outside the home?

THE WITNESS: Yes. Once we got Mrs. Horton away from the house and in handcuffs and behind a vehicle, Mr. Horton came out to the front porch, and other agents went and detained him on the front porch.

He had a set of keys on him, so I believe Agent Tabor took those keys and put them right inside the house to shut the door. That's as far as any agents went inside.

THE COURT: At any time during this incident did Ms. Horton make any threats to law enforcement officers?

THE WITNESS: No, ma'am.

THE COURT: At any time was she -- I understand she was present in the home, but at any time when Mr. Horton made these threats, was she right there with him that you could observe that she was present and heard the threats he was making?

THE WITNESS: No. When they came to the window, it was, you know, a smaller window so only one person can fit in this window, so I could not see Mrs. Horton when he was making these threats.

THE COURT: It's a mobile home, isn't it?

THE WITNESS: It is.

THE COURT: Okay. Any further questions for the agent?

MS. MACON: I have just one more, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MS. MACON:

Q. Do you believe that Ms. Horton was residing in this residence that we're discussing now when she was participating in the conduct that underlies the indictment?

A. Yes.

MS. MACON: Thank you. No further questions.

THE COURT: Mr. Kenney, any further questions?

MR. KENNEY: Just briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. KENNEY:

Q. When you and the other agents arrived, how soon after you arrived did the loudspeaker come across and say we have a federal warrant for Ms. Horton?

A. When Mr. Horton came out on the front porch the very first time when we asked to speak with Amanda, he went back inside. Then maybe about two minutes later when he came back out he was asking us what we needed with her, and as he was going in, that's when we verbally told him that we had an arrest warrant for Ms. Horton.

Q. Okay. You didn't say that upon initial contact with whomever would answer the door?

A. We did not, no.

Q. Why not?

A. We tried to keep the situation deescalated. We felt like other agents had been to their house before previously when they served her grand jury subpoena, and those two agents said that when they knocked, they came to the door and there was no incident.

So we were trying to treat this similar because a lot of times when we go to the door and we say we have an arrest warrant for the person that's not at the door, they'll tell us they're not home or -- it will just increase the level of escalation at that point.

Q. I understand that, but you would agree with me that if

you come to the front door of any home and say, "I'd like to speak to Mr. Kenney," and whoever answered the door said, "No" and then shut the door, they're under no obligation to you or anybody else at that point; isn't that correct?

A. That's correct.

MR. KENNEY: I don't have any other questions.

THE COURT: At some point you said you did use a loudspeaker to announce that you were federal agents and you had a warrant for Ms. Horton's arrest?

THE WITNESS: Correct.

THE COURT: Okay. After that was done for the very first time, how long was it before Ms. Horton came out?

THE WITNESS: I would have to go back and look at the body cam footage. I know we verbally told them initially the second time within the first two minutes that we were there.

THE COURT: That was to Mr. Horton, though?

THE WITNESS: That was to Mr. Horton. Then Agent Tabor is the one that be initiated the lights and sirens and bull horn. Then he got on the loudspeaker. I wouldn't know exactly how long in between.

THE COURT: Okay. I mean, did she come out immediately after that was done?

THE WITNESS: Oh, no. No, ma'am.

THE COURT: So it was several minutes later?

THE WITNESS: Yes. I would say that from the first time we used the loudspeaker, I would feel confident it was at least 20 minutes later that she was actually in custody.

THE COURT: When she came to the window originally, was she advised that there was a warrant for her arrest and she needed to come out?

THE WITNESS: Yes. I don't know the first time when she came to the window, but definitely the second time.

THE COURT: Okay. How long was it after that before she actually came out? 10 to 15 minutes, I believe you testified a moment ago.

THE WITNESS: Yes, ma'am.

THE COURT: I believe you testified previously that she had been subpoenaed before the grand jury?

THE WITNESS: Yes, ma'am.

THE COURT: She appeared both days?

THE WITNESS: Yes.

THE COURT: Okay. On the second day, she clearly stated she was not going to testify, correct?

THE WITNESS: Yes.

THE COURT: Of course, she has a Fifth Amendment right not to testify, correct?

THE WITNESS: Correct.

THE COURT: And she then left?

THE WITNESS: Yes, ma'am.

THE COURT: All right. Any further questions of the agent?

MR. KENNEY: No, Your Honor.

MS. MACON: No, Your Honor.

THE COURT: All right. You may step down. Thank you.

Further evidence.

MS. MACON: No, Your Honor. Other than we're relying on presumption in this case.

THE COURT: All right. Thank you.

Mr. Kenney, any evidence?

MR. KENNEY: Judge, I call my client to the stand.

THE COURT: All right. I trust, Mr. Kenney, you've advised as to her Fifth Amendment right against self-incrimination?

MR. KENNEY: I'm sorry, Judge?

THE COURT: I said I trust that you've advised your client as to her Fifth Amendment right against self-incrimination?

MR. KENNEY: Yes, ma'am. We're not going to talk about the facts of the case, merely her plans for when or if she is released.

THE COURT: All right. If you'll raise your right hand, the clerk is going place you under oath.

AMANDA HORTON, called by the Defendant, having been

first duly sworn, was examined and testified as follows:

THE COURT: Have a seat on the witness stand and answer questions of counsel, please.

DIRECT EXAMINATION

BY MR. KENNEY:

Q. Ms. Horton, I'm not going to ask you anything about the offenses that have been alleged by the United States, okay? I do want to ask you if Judge Sargent does set terms for your release, I want to talk to you about that, okay?

A. Uh-huh.

THE COURT: Ma'am, I need you to answer yes or no.

THE WITNESS: Okay.

THE COURT: Not head shakes or not uh-huhs or huh-uhs because we can't pick that -- I mean, it's not clear what the answer is on the recording, okay?

THE WITNESS: Yes.

THE COURT: Thank you.

BY MR. KENNEY:

Q. Now, ma'am, you have only been convicted of one misdemeanor offense in your life; is that correct?

A. Yes.

Q. And you will be 50 years old in about half a year; is that right?

A. Yes.

Q. At the time of your arrest a couple of days ago, tell us

about -- were you working?
A. I'm going to college online.
Q. Okay. Tell us about the schooling that you're in.
A. I'm going to Western Governors University online to get my business administration degree.
Q. Okay. Are you currently enrolled like this week in that program, or does it start back up in the fall?
A. It starts -- they do it in terms, and I start back in August.
Q. Okay. And how long have you been in that program?
A. For two years.
Q. So you have approximately how long to complete that program?
A. Two more years.
Q. All right. If you are admitted to bail and granted a bond, will you have any trouble keeping in contact with me?
A. No.
Q. And if the judge -- if the Court does set terms for your release, there is a high likelihood that you will not be able to reside in any home that has any dangerous weapons, dangerous animals, or firearms. Would you agree to abide by that?
A. Yes.
Q. Would you have any problem at all abiding by that?
A. No.

Q. Do you understand that if your husband didn't abide by that, that is a problem for you, and you would be returned to jail if it comes to light that the requirements were not met?
A. Yes.
Q. Another requirement that is likely is that you check in with a pretrial probation officer. Do you have any problems with that?
A. No.
Q. Do you have any problems being drug tested to ensure your compliance to not use drugs or alcohol or any type of prescribed drugs that are not prescribed to you?
A. No.
Q. Who else lives with you at your home?
A. My husband.
Q. Any children or any relatives or friends or anything of that nature?
A. No.

MR. KENNEY: All right. I don't have any other questions for you, ma'am. The United States or the Court may have some questions for you.

THE COURT: Ms. Horton, are you currently on probation or supervision out of Tazewell County?

THE WITNESS: No.

THE COURT: So you got a 90-day sentence with 88 days suspended, and they didn't put you on any type of

ongoing supervision?

THE WITNESS: No.

THE COURT: Okay. Thank you. You may.

MS. MACON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. MACON:

Q. Good morning, Ms. Horton. I believe you just testified you're currently a student and have been a student for a couple of years; is that right?

A. Yes.

Q. Do you have any sort of employment other than being a student?

A. No, not now.

Q. When was the last time you were employed?

A. In 2021.

Q. What was your employment in 2021?

A. Horton Electrical Services. We had a home business that we worked at.

Q. Was that self-employment?

A. Yes.

Q. Have you ever been self-employment in any other way?

A. No.

Q. Any other employment history to report?

A. Oh, yeah. I was a substitute teacher from 2005 until 2017 at Tazewell County Schools.

Q. How long have you resided at the residence in which you currently reside?

A. I've resided at that residence since 2019. It was right beside the other residence that I lived at, and I've lived there my whole life.

Q. When was the last time you had contact with anyone from Welch, West Virginia?

A. A long time ago.

Q. What is a long time ago? A few months? A few weeks?

A. No, years.

Q. Years?

A. A year, I would say a year.

Q. A year?

A. Yeah.

Q. So summer of 2025?

A. I would say. Something like that, yeah.

Q. Have you communicated via jail message with anyone from Welch since last summer?

A. Yeah, I did speak with one person from Welch.

Q. Was that Chuck Williams?

A. I did.

Q. After he was arrested; is that correct?

A. I did.

MS. MACON: No further questions, Your Honor.

THE COURT: Ma'am, let me ask you, when was it that

you appeared before the grand jury? I know you didn't actually appear, but you showed up here at the courthouse, correct?

THE DEFENDANT: Yeah. I appeared -- actually, I appeared on September -- I think it was in September. I'm not for sure but I think --

THE COURT: So it would have been last fall in 2025?

THE DEFENDANT: Right.

THE COURT: All right. So sometime last fall?

THE DEFENDANT: Yeah. I appeared one day, and I was asked to come back. I spoke with someone from the -- I called the office of the -- the attorney's office, and the lady told me that I didn't need to be here, that I had already given my statement and that I didn't need to be here.

THE COURT: Are you currently in any mental health treatment?

THE DEFENDANT: No.

THE COURT: Not taking any mental health meds?

THE DEFENDANT: No.

THE COURT: Are you taking any medications?

THE DEFENDANT: I'm on Suboxone.

THE COURT: Why are you on Suboxone?

THE DEFENDANT: Mainly for pain. I have some bad disks in my back from some car accidents and from some problems when I was younger, and I have some severe pain in

my back and my legs.

THE COURT: Is there a reason why you didn't say that or didn't tell that to the probation officer who interviewed you?

THE DEFENDANT: I did tell her that.

THE COURT: Do you have a local treating physician?

THE DEFENDANT: I go online. I don't have someone local but I do go online.

THE COURT: If the Court requires you to get a local treating physician, can you do that?

THE DEFENDANT: I can, yes.

THE COURT: Are you currently covered by Medicaid?

THE DEFENDANT: Yes.

THE COURT: I'm sorry, Mr. Kenney, did you have further questions for your client?

MR. KENNEY: I do not, Your Honor.

THE COURT: All right. Any further questions?

RECROSS-EXAMINATION

BY MS. MACON:

Q. Ms. Horton, I believe the pretrial services officer asked you about your substance abuse history. When is the last time you used heroin?

A. It's been a long time for that. Probably years.

Q. Have you ever used fentanyl?

A. I was on a patch for a long time because of my back and

my problems with my insides where I've had some many surgeries, but other than that I don't think I've ever done any fentanyl.

Q. Methamphetamine?

A. No.

Q. What do you mean by "no"?

A. I'm not on anything.

Q. Have you ever used methamphetamine?

A. I have. It's been a long time.

Q. What does a long time mean? A month? A year?

A. No. I'm not sure how long it's been really. It's been a long time, though. It's over a year, probably two years.

Q. How often were you using meth when you were using it?

A. I tried it a couple times. I have narcolepsy and I tried it to try to stay awake. I couldn't stay awake. I was falling asleep driving and everything else.

Q. You said you tried it a couple of times?

A. Yeah.

Q. That's it?

A. Yeah.

Q. And it's been over a year since you used it?

A. Oh, yeah.

Q. But only a couple of times?

A. Uh-huh.

THE COURT: Ma'am, I need you to answer yes or no,

please.

THE DEFENDANT: Yes.

THE COURT: Thank you.

BY MS. MACON:

Q. Do you have any dogs at your residence?

A. No.

THE COURT: Ma'am, let me ask, you live in a mobile home, correct?

THE DEFENDANT: It's a double-wide.

THE COURT: Okay. The land that it's on, do you and your husband own the land?

THE DEFENDANT: It's his mother's.

THE COURT: His mother's land?

THE DEFENDANT: Yes.

THE COURT: Okay. Do you and your husband own the mobile home, the double-wide?

THE DEFENDANT: No. She still owns it also, but she lets us live there. We have a mobile home below there that we owned prior to moving there, but we ended up moving up there.

THE COURT: Okay. The mobile home that you owned prior, is it still there too?

THE DEFENDANT: It's down on the other piece of property, yes.

THE COURT: Okay. You own that?

THE DEFENDANT: Yes.

THE COURT: Is it on land that you and your husband own?

THE DEFENDANT: Yes, I own the land.

THE COURT: You own that land?

THE DEFENDANT: Uh-huh.

THE COURT: The reason I'm asking is if the Court should release both of you but order you can't live together, can arrangements be made?

THE DEFENDANT: Yes.

THE COURT: All right. You may.

MS. MACON: No further questions, Your Honor.

THE COURT: All right. Any further questions?

MR. KENNEY: No followup, Judge.

THE COURT: All right. You may step down. Thank you, ma'am.

THE DEFENDANT: Thank you.

THE COURT: All right. Further evidence from the government?

MS. MACON: No, Your Honor.

THE COURT: Arguments?

MS. MACON: Just briefly, Your Honor. The government relies on presumption in this case and also the circumstances of what occurred yesterday. We understand that it wasn't Ms. Horton herself who made the statements to law

enforcement, but I believe the evidence is pretty clear that she should have at least been aware of what was going on and she did not comply, which I think demonstrates she -- or at least the government has serious concerns that she will comply with any conditions of release should she be released.

Thank you, Your Honor.

THE COURT: Mr. Kenney.

MR. KENNEY: Your Honor, when assessing whether or not Ms. Horton is a good candidate for bond, we would say that she is, Judge, and there are several reasons for that.

Number one is her ties to the area. She has essentially lived in the same place for all of her life. She'll be 50 years old in a few months and has very little criminal history to speak of, a misdemeanor that happened last year is all. I think that speaks volumes, Judge, and I think that assists in overcoming the presumption of bond in this case.

We have someone that is not used to contact with law enforcement. Did everything go swimmingly two days ago? No, it didn't. I would offer to the Court that most of that seemed to come from her husband for whatever reason.

I believe, and I would argue, Judge, that she has been remarkably compliant concerning the grand jury subpoenas. She appeared, she exercised her Fifth Amendment rights, and then left.

We are unclear as to if she was in the shower, how long she was in the shower, when she got in there, but it appeared from the agent's testimony that this whole situation took about 40 minutes, so this wasn't a long protracted incident. There was no brandishing of any dangerous weapons or firearms.

Given her lack of criminal history and given her history itself, we would offer to the Court that she will obey the terms and conditions that this Court sets. If not, she'll quickly realize that probation service does an excellent job. I'm sure the agents, if she is admitted to bond, will also be other eyes and ears in the community to alert the Court if there are any additional problems or any restrictions that are not complied with.

But, Judge, she was doing productive things before she was arrested, such as in school. She is to be commended for going back to school for a couple of years, and she hopes to complete that degree.

So, Judge, for all of those reasons, we believe that there is an alternative to detention at this point. We believe that based on her lack of criminal history and just who she is, her characteristics, help overcome that as well, and that there are terms and conditions that the Court could set here to help be a prophylactic measure to ensure compliance through substance abuse testing. If the Court --

one of the requirements in the pretrial service information, Your Honor, was that she attend mental health counseling, and I don't think that would be a bad idea at all.

There are terms and conditions that the Court could set that are alternatives to detention at this point, and that's what we're asking the Court to do.

THE COURT: All right. Thank you.

Anything further, Ms. Macon?

MS. MACON: No, Your Honor.

THE COURT: Mr. Kenney, let me just ask this: If I release Ms. Horton, can she make arrangements for someone to get her today?

THE DEFENDANT: Yes.

THE COURT: Okay. I just don't want to strand her on the streets of Abingdon.

Ms. Horton, if you'll stand. Ms. Horton, the charge you face is a very serious charge, ma'am. It carries a presumption of detention. Now, the question is has the evidence before me rebutted that presumption of detention?

Insofar as it's presumed that you would present a risk of flight, the facts surrounding your arrest, ma'am, are not good. I'm going to say that at best it was highly foolish; at worst it was highly reckless.

The fact that everyone got through yesterday without someone being hurt is a minor miracle, and it showed

remarkable restraint, quite frankly, on behalf of the officers involved.

THE DEFENDANT: Yes.

THE COURT: But, you know, it's clear that you have known that you've been under investigation in this drug conspiracy for over half a year, and when you now have been charged, they have gone and found you exactly where they expected to find you. So I think that evidence in some ways rebuts any presumption that you present a risk of flight.

The facts and circumstances of your arrest yesterday show, at best on your part, reluctance to come out of the home, but it does not show to me that you were the person making any threats to the officers.

But I want to be clear about this. Your actions yesterday would have been -- if somebody would have been hurt, your actions yesterday would have been responsible for that. You know, when you fail to follow the instructions of the officer to just peaceably come out of the home once you knew there was a warrant for your arrest, that allowed that incident to escalate.

As Agent Levesque spoke, you know, you were one step away from the SWAT team or the tactical team being called and making force entry on your home, and someone would have likely been injured in that. And, ma'am, you're responsible for that. While your husband was making the threats, your

reluctance to come out of the home is responsible for that.

So I want to make clear that when I put you on supervision in a moment, you better follow the instructions of my probation officers because this is a case where I can just simply revoke your bond and put you back in custody, okay? So I want to be clear about that.

Now, insofar as you pose a danger to the community or others, you don't have hardly any criminal history. You have one misdemeanor conviction. It looks like other than these alleged charges and the allegations here that you've lived pretty peaceably in the community for years.

I'm a little concerned that you have some untreated mental health and/or current substance abuse issues, and because of that I'm going to put some conditions on you to address that. But I do believe that there are conditions or combinations of conditions that I could put on you to address any concern I have that you pose a danger to the community or others.

So I'm going to release you on bond. It's going to be a $10,000 unsecured bond, which means you don't have to post any property or cash today, but you are obligated in that amount to the United States government should you not appear as required or should you not comply with your conditions of release.

Now, I want you to listen carefully as I go over

your conditions of release with you because I'm going to expect strict compliance, ma'am. Now, I want to be clear about this. My officers are going to come to your house. Probation officers are going to come to your house, and they're going to do home inspections, walk-throughs. If they have any problem when they appear, any delay when they come to the door with getting you to come to the door, then I will bring you back before me, I will revoke your bond, and I will incarcerate you pending your trial. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. So I want to be clear about that. Your husband is not going to be allowed to reside with you if I should release him. So y'all are going to have to work out these living arrangements if both are released.

I want to be clear that I'm not going to allow any hesitancy from you in complying with your instructions from your supervising officers.

Your bond is going to be subject to the following conditions: That you report for service of any sentence that should be or may be imposed should you be convicted of the charges that you face;

That you cooperate in the collection of a DNA sample if that collection is authorized by federal law;

That you appear in court as required. I cannot tell you right now when your next court date will be. We've

arraigned you today, and we've taken care of the issue of bond today. You will have to stay in contact with Mr. Kenney, okay?

There is likely to be a pretrial conference date and a trial date set soon in your case, and you may or may not have to be present. I don't even know if Judge Ballou requires the defendants to be present for the pretrial conference because I think he does a lot of them by telephone.

MR. KENNEY: That's my experience with Judge Ballou as well, Your Honor.

THE COURT: All right. But you need to follow the instructions of your counsel, okay?

You must not violate any federal, state, or local laws while you're on bond.

You must avoid contact outside the presence of your counsel with any alleged victims or potential witnesses regarding your case.

You must report as directed by your supervising officer, follow the directions of your supervising officer, and promptly report any personal status changes to your supervising officer.

Now, that would include any changes in address, employment, telephone number. More importantly, however, if you are contacted by law enforcement officers regarding a

criminal investigation, you must immediately report that; or if you face any additional criminal charges, including traffic offenses, those must immediately be reported to your supervising officer.

I'm going to order that you must abstain from the use of alcohol, and you must abstain from the use or possession of any controlled substances unless you have those substances and you're using them in accordance with a valid prescription given to you by a licensed treating physician for a legitimate medical purpose.

You shall not possess a firearm or other dangerous weapons, and you must reside in a residence free of such. Once you return to your home, I want to give you 24 hours to get all firearms out of the home, and they must be placed somewhere where you don't have any custody or control of the firearms.

You must submit to random routine drug and/or alcohol testing as directed by your supervising officer, and I'm going to order that you must submit to an evaluation for mental health and/or substance abuse.

I'm going to order that you must arrange that mental health and substance abuse evaluation, which you can do with Cumberland Mountain Community Services, and that you must make those arrangements in the next 14 days.  Now, the evaluation doesn't have to occur within the next 14 days, but

you have to call and make the appointment for those evaluations within the next 14 days.

You must allow open communications between any physical or mental health substance abuse counseling treatment program and your supervising officer, the probation office. You must also comply with any recommended counseling or treatment program at your own expense that's recommended.

I'm going to further order that within the next 14 days you must make arrangements to try to obtain a local treating physician and go in to have a physical evaluation of your health. That would include getting an evaluation of whether or not you need to be in any type of pain management program, okay?

You shall not travel outside the Western District of Virginia without first obtaining permission of your supervising officer.

You must submit to warrantless search and seizure of your person and property as directed by your supervising officer for the purposes of determining if you're in compliance with the conditions of release.

I am going to order that you must begin to actively seek employment, and if you obtain employment, you must maintain that employment. While your husband is incarcerated, he's going to lose his social security disability benefits. If he remains incarcerated, you're

going to have to have some way of supporting yourself, so I'm going to order that you should begin to do that.

If you possess a passport, you must surrender your passport to be held by the probation office pending further order of the court. If you do not currently possess a passport, you may not apply to obtain a passport while you're on bond.

You shall not associate with any known possessors, users, manufacturers, or distributors of illegally controlled substances and shall not be present in any location where controlled substances are being illegally possessed, used, manufactured, or distributed unless approved by your supervising officer in cooperation with law enforcement officers.

Ms. Taylor, can you think of any other conditions?

PROBATION OFFICER: No, Your Honor.

THE COURT: Does the government have any other recommended conditions?

MS. MACON: May the Court consider to the extent she does the mental health evaluation and ends up in treatment, anything with substance abuse, imposing a condition that she sign all waivers necessary?

THE COURT: Oh, I thought I did that.

MS. MACON: Oh, okay. I'm sorry if I missed that.

THE COURT: She must sign all releases to allow open

communications between with of her treatment agencies for either physical, mental, or substance abuse and the probation office, and she may not revoke those releases while she's on supervision.

MS. MACON: Also, Your Honor, perhaps a condition that she not have any contact with any of her codefendants.

THE COURT: My condition is that she may not contact any of her codefendants about the case outside the presence of her counsel, okay?

Now, Ms. Horton, surely Mr. Kenney is going to tell you he doesn't want you to have any contact with any of your codefendants, and many of them are in custody.

But my condition just simply says that you should not have contact with any of your codefendants regarding your testimony, regarding the defense of the case, outside the presence of your counsel. That could be coordinated with your counsel if you need to speak with them.

MS. MACON: Nothing further, Your Honor.

THE COURT: All right. Now, Ms. Horton, let me ask you this: Do you understand your conditions of release?

THE DEFENDANT: Yes.

THE COURT: If I release you on bond subject to these conditions, do you agree to abide by these conditions?

THE DEFENDANT: Yes.

THE COURT: Now, if I sign this bond paperwork and

you sign this bond paperwork, whenever you're taken back to the jail, and it will be later this morning because we have other people in custody, so it won't be right away, you're going to be released.

Are you going to be able to make arrangements to get somebody to pick you up, or do you need probation's help in calling a family member or someone to pick you up?

THE DEFENDANT: I can get a hold of my son.

THE COURT: All right. I just don't want to strand you on the streets of Abingdon. If I have to, I can hold you another day.

THE DEFENDANT: No, that's okay.

THE COURT: I just want to make sure that you've got somebody who can come and get you today.

THE DEFENDANT: I do.

THE COURT: All right. Do you have any questions for the Court today?

THE DEFENDANT: No.

THE COURT: All right. Counsel, do you know of anything further that we need to take up in Ms. Horton's case.

MS. MACON: No, Your Honor.

MR. KENNEY: Your Honor, if we could have just a moment to sign the Waiver of Speedy Trial.

THE COURT: That's fine. I'm going to let you do

that off the record. I've advised her with regard to her rights here. She can sign that, and we can file it with the court.

MR. KENNEY: Yes, ma'am. May I have a word with the Court after that?

THE COURT: You may. If it's about the case, if Ms. Macon will step out as well.

The court will stand in recess.

(Proceedings concluded at 9:52 a.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript, to the best of my ability, of the court's audio recording of proceedings in the above-entitled matter.

/s/

Cynthia L. Bragg

August 6, 2026